FAX or Internet

UNITED STATES DISTRICT COURT

for the

District of Arizona

In the Matter of the Search of:

**Information associated with phone number/account 928-663-8208 [SUBJECT ACCOUNT] that is stored at premises controlled by AT&T**

)
)
)
)
)

Case No.    24-04305 MB

## ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer.

An electronic application by a federal law enforcement officer for the government requests the search of the following person or property located in the **Northern District of Texas**:

*(identify the person or describe the property to be searched and give its location)*: **See Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:  **See Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before

_____
September 3, 2024
*(not to exceed 14 days)*

☐ in the daytime 6 a.m. to 10 p.m.    ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the search warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a search warrant copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
__Any Magistrate Judge in the Dist. of Arizona__       .
                                    *(Name)*

☐ I find that immediate notification may have an adverse result as specified in 18 U.S.C. § 3103a  (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____ .

Date and Time Issued:  August 20, 2024

**Camille D. Bibles**   Digitally signed by Camille D. Bibles
Date: 2024.08.20 15:04:44 -07'00'

_____
*Judge's Signature*

City and State:     Flagstaff, Arizona         Camille D. Bibles, United States Magistrate Judge

| Return | | |
|---|---|---|
| Case No.:<br>   24-04305 MB | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
|      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing Officer's Signature*

_____
*Printed Name and Title*

**<u>ATTACHMENT A</u>**

**DESCRIPTION OF THINGS TO BE SEARCHED**


This search warrant applies to information associated with AT&T cellular telephone number **928-663-8208**, which is stored at the premises owned, maintained, controlled, or operated by AT&T Mobility LLC, also known as AT&T Wireless and <u>marketed</u> as AT&T, an American telecommunications company headquartered in Dallas, Texas.  It is a <u>wholly owned subsidiary</u> of <u>AT&T Inc.</u> and provides <u>wireless services</u> in the <u>United States</u>.

**ATTACHMENT B**

## I.   Information to be Disclosed by AT&T to the Government

To the extent that the information in Section I of Attachment B is within the possession, custody, or control of the AT&T (i.e., the Service Provider), including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to cellular telephone number **928-663-8208**:

1.      Names (including subscriber names, user names, and screen names).

2.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses).

3.      Local and long-distance telephone connection records from June 11, 2024, through June 16, 2024;

4.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ["IP"] addresses) associated with those sessions, from June 11, 2024, through June 16, 2024;

5.      Length of service (including start date) and types of service(s) utilized;

6.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers

("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identifiers ("IMEI"); and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address).

7.     Means and source of payment for such service (including any credit card or bank account number) and billing records;

8.     Any other indicia of use (not listed above) of the account, including reference to anyone's names who may have used the account (e.g., information in the texts or phone numbers associated with the account), subscriber information pertaining to the account and/or identifiers, payment information, or other unique identifiers for the associated with the account).

9.     All records and other information relating to the SUBJECT ACCOUNT from **June 11, 2024, through June 16, 2024**, including:

a.     All text message (including SMS and iMessage) content currently stored;

b.     All usage data to include Call Detail records, SMS detail, cell site and cell site sector information;

c.     All available toll records to include call detail, SMS detail, data

session, cell site and cell site sector information, and round-trip delay information including RTT/PCMD data; and

        d.    Records of user activity for each connection made to or from the account, including log files; messaging logs; the date, time, length and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses.

## II.      Information to be Searched for and Seized by the Government

The items to be searched for and seized, which are associated with cellular telephone number **928-663-8208 [SUBJECT ACCOUNT]**, are as follows:

1.    Names (including subscriber names, user names, and screen names).

2.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses).

3.    Local and long-distance telephone connection records from June 11, 2024, through June 16, 2024;

4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ["IP"] addresses) associated with those sessions from June 11, 2024, through June 16, 2024;

5.    Length of service (including start date) and types of service(s) utilized;

6.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers

("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identifiers ("IMEI"); and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

7.     Means and source of payment for such service (including any credit card or bank account number) and billing records;

8.     All voice mail, text, and multimedia messages between the SUBJECT ACCOUNT and **(302)-750-5970** from June 11, 2024, through June 16, 2024, stored and presently contained in, or on behalf of the account or identifier;

9.     All usage data to include Call Detail records, SMS detail, cell site, and cell site sector information from June 11, 2024, through June 16, 2024;

10.     All available toll records to include call detail, SMS detail, data session, cell site and cell site sector information, and round-trip delay information including RTT/PCMD data from June 11, 2024, through June 16, 2024;

11.     Records of user activity for each connection made to or from the account from June 11, 2024, through June 16, 2024, including log files; messaging logs; the date, time, length and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses.

12.    Any other indicia of use (not listed above) of the account, including reference to anyone's names who may have used the account (e.g., information in the texts or phone numbers associated with the account), subscriber information pertaining to the account and/or identifiers, payment information, or other unique identifiers for or associated with the account) from June 11, 2024, through June 16, 2024;

13.    Any other evidence indicating the geographic location of the cellular device at times relevant to the investigation, including June 11 and 12, 2024;

14.    Any other information that constitutes fruits, evidence, and/or instrumentalities of violations of 18 U.S.C. § 113 (a)(4) or 18 U.S.C. § 2244(b); and

15.    Any contextual information necessary to understand the above evidence.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

FAX or Internet

# UNITED STATES DISTRICT COURT

for the
District of Arizona

In the Matter of the Search of:

| | |
|---|---|
| **Information associated with phone number/account 928-663-8208 [SUBJECT ACCOUNT] that is stored at premises controlled by AT&T** | Case No.  24-04305 MB |

## ELECTRONIC APPLICATION FOR SEARCH WARRANT

I, the undersigned, a federal law enforcement officer, request an electronic search warrant and state under penalty of perjury that I have reason to believe that on and within the following person or property:

**See Attachment A.**

located in the _____Northern_____ District of _____Texas_____ , there is now concealed:

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

[X] evidence of a crime;

[ ] contraband, fruits of crime, or other items illegally possessed;

[ ] property designed for use, intended for use, or used in committing a crime;

[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Sections* | *Offense Descriptions* |
|---|---|
| 18 U.S.C. § 113(a)(4) | Assault by Striking/Beating/Wounding |
| 18 U.S.C. § 2244(b) | Abusive Sexual Contact |

The application is based upon the following facts:

[X] Continued on the attached sheet (see attached **Affidavit**).

[ ] Delayed notice _____ days (give exact ending date if more than 30 days) days:
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by: */s/ AUSA Dondi Osborne*

**Pursuant to 28 U.S.C. §1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

ELIZABETH DIETZEN
Digitally signed by ELIZABETH DIETZEN
Date: 2024.08.20 12:42:43 -04'00'

*Applicant's Signature*

Executed:  August 20, 2024

Elizabeth Dietzen, Special Agent, National Park Service
*Printed Name and Title*

___X___ Sworn by Telephone

Date/Time  August 20, 2024

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2024.08.20 14:58:56 -07'00'

*Judge's Signature*

City and State:  Flagstaff, Arizona

Camille D. Bibles, United States Magistrate Judge
*Printed Name and Title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

In the Matter of the Search of:

**Information associated with phone number/account 928-663-8208 [SUBJECT ACCOUNT] that is stored at premises controlled by AT&T**

Case No. ___24-04305 MB_____

## ELECTRONICALLY SUBMITTED AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Elizabeth Dietzen being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant for information associated with certain account(s) that are stored at premises owned, maintained, controlled, or operated by AT&T, a wireless provider headquartered at 208 South Akard Street, STE 370, Dallas, Texas 75202. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require AT&T to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.       I am a Special Agent (SA) with the National Park Service (NPS), United States Department of the Interior. I am presently assigned to the Intermountain Region, duty stationed at Grand Canyon National Park. I have been employed as a law enforcement officer with the NPS since 2012, and I have worked in the role of Special Agent and as a U.S Park Ranger in

Maryland, Arizona, Nevada, and California. I have received training at the Federal Law

Enforcement Training Center, completing the Land Management Police Training. I have

attended numerous training courses in a variety of law enforcement subjects and have conducted

criminal investigations into a variety of offenses.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of 18 U.S.C. § 113(a)(4)(Assault by

Striking/Beating/Wounding) and 18 U.S.C. § 2244(b)(Abusive Sexual Contact) have

been committed by Maurice Maverick TSOSIE.  There is also probable cause to search the

information described in Attachment A for evidence of these crimes further described in

Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court in the District

of Arizona is "a district court of the United States that has jurisdiction over the offense being

investigated." 18 U.S.C. § 2711(3)(A)(i).

## INTRODUCTION

6.     This case involves the investigation into assault and abusive sexual contact committed within the confines of Grand Canyon National Park in the District of Arizona on June 11, 2024. Based on my training and experience, I know that Grand Canyon National Park is an area within the special maritime and territorial jurisdiction of the United States.

7.     The suspect in this incident was identified through investigation as Maurice Maverick TSOSIE, who is an adult (21-year-old, born 2002) male and who is an employee of Canyon Rides on the North Rim of the Grand Canyon. Canyon Rides is a concession operated company within Grand Canyon National Park. The victim in these incidents is identified as M.S.M, who is an adult (25 year-old) female.

8.      The incidents of assault and abusive sexual contact occurred on June 11, 2024, between approximately 2030 and 2230 hours, at TSOSIE's residence on the North Rim of the Grand Canyon, which is in the District of Arizona and within the special maritime and territorial jurisdiction of the United States. During the incident, TSOSIE bit M.S.M.'s neck and forcibly groped M.S.M.'s vaginal area without M.S.M.'s consent, in violation of 18 U.S.C. §§ 113(a)(4) and 2244(b).

9.     This is a common affidavit in support of a search warrant for evidence of the above-referenced violations from TSOSIE's phone account: (928)-663-8208 (SUBJECT ACCOUNT). The electronic data sought by your affiant in the SUBJECT ACCOUNT is stored at premises owned, maintained, controlled, or operated by AT&T, a cellular company headquartered at 208 South Akard Street, STE 370, Dallas, Texas 75202.

10.    The phone number associated with TSOSIE is identified as (928)-663-8208 [SUBJECT ACCOUNT]. A preservation request for the SUBJECT ACCOUNT was sent to AT&T on June 17, 2024. The SUBJECT ACCOUNT was identified as TSOSIE's account through the following means:

   i.    Original, not third party application, text messaging screenshots provided to your affiant by both TSOSIE and M.S.M.;

   ii.    TSOSIE has texted and called your affiant from the SUBJECT ACCOUNT number;

   iii.    Your affiant called the SUBJECT ACCOUNT number and TSOSIE answered the calls;

   iv.    When your affiant interviewed TSOSIE, he showed agents original text messaging to M.S.M.

11.    This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AT&T to disclose to the government records and other information (including the content of communications) particularly described in Attachments A and B.

## **PROBABLE CAUSE**

12.    On June 12, 2024, at approximately 0749 hours, Grand Canyon National Park Rangers received a report of a sexual assault that occurred on June 11, 2024, on the North Rim of the Grand Canyon in the mule wrangler housing area. Supervisory United States Park Ranger (SUSPR) Matthew Krupp and United States Park Ranger (USPR) Aaron Zavesky arrived at the

North Rim Visitor Center to meet with the victim (M.S.M.) and her father at approximately 0810 hours. SUSPR M. Krupp took M.S.M. and her father to Station 3 for an evaluation and initial interview. SUSPR M. Krupp observed the following injuries on M.S.M.:

     i. Patterned bruising on the left-side of M.S.M.'s neck that resembled a bite mark.
    ii. Patterned bruising on M.S.M.'s left breast area.
   iii. Patterned bruising / petechiae on M.S.M.'s left chest.
   iv. Bruising on the back of M.S.M.'s left upper arm.
    v. Petechiae on M.S.M.'s abdomen.

13.    In the initial interview with M.S.M. on June 12, 2024, she stated to rangers that she had been at the Rough Rider Saloon on the North Rim on the evening of June 11, 2024. At around 1800 hours, M.S.M. was approached by Maurice Maverick TSOSIE and another wrangler, later identified as Kyle Walker. TSOSIE and Walker began speaking to M.S.M. about mule riding because M.S.M. had done a mule ride earlier in the day on the North Rim. Eventually, Kyle left the saloon and TSOSIE and M.S.M. continued to speak to each other. Both TSOSIE and M.S.M. had consumed alcohol. M.S.M. estimated she had a total of three drinks and estimated that TSOSIE had three shots of tequila and three mixed drinks. At some point, TSOSIE invited M.S.M. to a bonfire at his residence. At around 2000 hours, M.S.M. contacted her father to come pick them up. M.S.M.'s father transported M.S.M. and TSOSIE to TSOSIE's residence at 2 Spruce Road. While at TSOSIE's residence, TSOSIE began making comments to M.S.M. about how she looked "trans" and that he needed to check to see if M.S.M. was "trans." TSOSIE then forced his hand down M.S.M.'s pants while she was sitting on his daybed.[1]

---

[1] M.S.M. provided a diagram of the inside of Tsosie's trailer. The sleeping quarters of the residence were in the living area, as a single daybed served as both a couch and Tsosie's bed.

M.S.M. told TSOSIE, "no" and "stop" multiple times. M.S.M. stated that TSOSIE also pinned her down on the daybed by grabbing her arms. While he pinned her down, TSOSIE bit M.S.M.'s neck and breasts leaving visible bruising. M.S.M. told TSOSIE to stop multiple times. Eventually, TSOSIE stopped and M.S.M. obtained a recording on her phone of TSOSIE speaking about the incident. M.S.M. then ran out of the trailer to her dad and drove away with her father.

14.      In an interview your affiant and Special Agent (SA) Phil Oakes conducted with M.S.M. on June 14, 2024, she elaborated on the events that occurred on June 11, 2024, at TSOSIE's trailer. M.S.M. said that while she was sitting on TSOSIE's daybed, she remembered that everything "went black" and TSOSIE was on top of her, holding her down. M.S.M. used both of her hands and tried to pull TSOSIE's hand out of her pants while screaming, "no, no, no." While she was yelling "no, no, no," TSOSIE was murmuring and ignoring her. M.S.M. believed that was when he was biting her neck and breasts. When TSOSIE was biting her neck, M.S.M. described it as feeling "scary, hard and painful." M.S.M. said that it felt like something "was going to pop" in her neck.  TSOSIE put his hand in M.S.M.'s underwear while she was telling him "no, no, no" and that she "didn't want that." TSOSIE "forced his way down in there." M.S.M. remembered trying to stop TSOSIE from getting "lower and lower," and he "forced" his way into her underwear. MSM felt pressure bilaterally on her upper arms, her abdomen, and on her legs. She described TSOSIE's actions as "harsh, brash, quick, impulsive." M.S.M. stated that she was focused on getting Tsosie's hand out of her pants because, "if I didn't, he was going to fully rape me." M.S.M. stated that she had to do "everything [she] could, to stop this now." M.S.M. estimated that the struggle lasted about a "minute or two" but it "felt like forever." M.S.M. was eventually able to get TSOSIE's hand out of her underwear, and she got up and

began recording TSOSIE surreptitiously with the phone in her pocket. M.S.M. told TSOSIE, "I repeatedly asked you to stop, and you didn't." TSOSIE replied, "yes, I had to find out for myself." M.S.M. recalled that during the assault, TSOSIE said things to her like, "you're trans, I think you're trans," and "you're tricking me, you're trans," and "you're lying to me, you're trans" and "you want to have sex with me because you're trans." After recording TSOSIE, M.S.M. ran out of the trailer to her dad and told him, "let's get the fuck out of here because this man is a crazy person." M.S.M. unintentionally left a small bag and her identification card at TSOSIE's residence.  M.S.M. and her father drove away and camped hidden in a parking lot for the night until they could report the assault to rangers in the morning.

15.     In the interview your affiant conducted with M.S.M, she said that she and TSOSIE had exchanged texts and Tsosie had also attempted to call her. M.S.M. stated that they began conversing via text message when they first met at the Roughrider Saloon on June 11, 2024.  At 2107 hours, M.S.M sent TSOSIE two text messages. The first message read "Maddy" followed by "employee drive thru."  At 2119 hours, TSOSIE responded with "Mmmmm."  The day following the assault, June 12, 2024, TSOSIE sent M.S.M. a text message at 0518 hours which said, "Morning," and at 0921 hours, TSOSIE sent M.S.M. a text message that said, "You forgot your lil bag and glasses." On June 13, 2024, at 1225 hours, TSOSIE texted, "I found your ID while cleaning idk what you want me to do with it..I can drop it off at the lodge after work," and at 1228 hours, TSOSIE texted "I'll just drop it off at the lodge when I'm off." At 1229 hours, M.S.M. responded, "Drop it off at the lodge front desk." At 1229 hours, TSOSIE responded, "Alright then I'll do that when I get off." At 1246 hours, TSOSIE texted, "I'll let you know when I drop it off after work. Hagd."  (Based on common sense and experience texting, "Hagd," likely means, "have a good day.")  On June 13, 2024, at 1424 hours, TSOSIE called M.S.M.  Once

M.S.M. recognized who it was, she hung up. M.S.M. provided agents a screenshot of her call log, which showed that the call between M.S.M. and TSOSIE lasted 14 seconds.

16.     The phone number from which M.S.M. communicated with Tsosie was (302)-750-5970.

17.     M.S.M. provided Agents and Rangers with the surreptitious recording she made while with TSOSIE shortly after the assault. M.S.M. stated that she had placed her phone in her back pocket as it was recording. As a result, portions of the recording are difficult to hear and no persons are visually identified on the video. Based on your affiant's review of the recording, on June 11, 2024, at 2226 hours, M.S.M. stated, "I asked you to stop and you didn't, right?" TSOSIE responded, "and I had to find out myself."  M.S.M. then said, "right, and you didn't try to stop, right?"  TSOSIE replied, "so finally I did."  M.S.M. then stated, "and you finally learned that you should stop, right? I get it, I get it."  TSOSIE can then be heard saying, "Come here a minute. And I found out. Are you trans?"  M.S.M. stated, "No I'm not trans, no, look at me. No, no. I'm nervous."

18.     On June 15, 2024, your affiant and S.A. Phil Oakes worked with M.S.M. to text TSOSIE about the sexual assault. M.S.M. texted TSOSIE and thanked him for dropping off her property at the North Rim Lodge front desk. Approximately one minute after that message is sent, TSOSIE responded with, "no problem, I didn't want all that drama but hopefully we can still talk." M.S.M. responded with S.A. assistance, stating, "we can still talk but I'm still processing how you hurt me." TSOSIE asked M.S.M. how he hurt her and "what did you even say to the rangers?" In a series of text messages thereafter, TSOSIE said "...sorry for everything I

don't remember much" and "I'm honestly sorry for everything" and "I wanna get to know you more." M.S.M. asked TSOSIE, "Sooooo did you really think I was trans?!" TSOSIE responded, "kind of but I was drunk asf" and "Idk what I was saying." (Based on common sense and experience texting, "asf" likely means, "as fuck," and "Idk" likely means, "I don't know.") In the monitored text messaging between M.S.M. and TSOSIE, agents learned that TSOSIE was at his home in Chinle, Arizona.

19.     At the conclusion of the monitored text messaging between M.S.M. and TSOSIE, your affiant and S.A. Phil Oakes travelled to Chinle, Arizona, to attempt to interview TSOSIE. On June 16, 2024, TSOSIE was located and agreed to speak with agents after he was informed of his *Miranda* rights. During this interview, TSOSIE stated that he stuck his hand down M.S.M.'s pants while the two of them were on the bed in his trailer. TSOSIE wanted to check if "she had a penis," so he put his hand down her pants. M.S.M. said "no" two or three times. TSOSIE pulled his hand out of her underwear and then went back in. While his hand was in her underwear, M.S.M.'s hands were trying to pull his hand out. TSOSIE continued to hold his hand in M.S.M.'s pants. M.S.M. moved her legs tightly together to prevent his hand from going lower toward her vagina. TSOSIE kept his hand down M.S.M.'s pants while she was trying to pull his hand out. TSOSIE apologized and stated he had eight beers and three mixed drinks that night.

20.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for AT&T subscribers may be located on the computers of AT&T.  Further, I am aware that

computers located at AT&T contain information and other stored electronic communications belonging to unrelated third parties.

21.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of AT&T for weeks or months.

22.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS") and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by AT&T for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

23.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long-distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may

also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

24.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

25.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

26.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses,

the address to which any equipment was shipped, the date on which the account was opened, the

length of service, the types of service utilized, the ESN or other unique identifier for the cellular

device associated with the account, the subscribers' social security numbers and dates of birth,

all telephone numbers and other identifiers associated with the account, and a description of the

services available to the account subscribers.  In addition, wireless providers typically generate

and retain billing records for each account, which may show all billable calls (including outgoing

digits dialed).  The providers may also have payment information for the account, including the

dates, times and sometimes, places, of payments and the means and source of payment

(including any credit card or bank account number).

27.     In some cases, wireless subscribers may communicate directly with a wireless

provider about issues relating to the account, such as technical problems, billing inquiries, or

complaints from other users.  Wireless providers typically retain records about such

communications, including records of contacts between the user and the provider's support

services, as well records of any actions taken by the provider or user as a result of the

communications.

28.     As explained below, information stored at the wireless provider, including that

described above, may provide crucial evidence of the "who, what, why, when, where, and how"

of the criminal conduct under investigation, thus enabling the United States to establish and

prove each element or alternatively, to exclude the innocent from further suspicion.  In my

training and experience, the data pertaining to a particular cellular device that is retained by a

wireless provider can indicate who has used or controlled the cellular device.  This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

search warrant at a residence.  For example, data collected at the time of account sign-up,

information relating to account payments, and communications (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled a cellular device at a

relevant time.  Further, such stored electronic data can show how and when the cellular device

and associated cellular service were accessed or used.  Such "timeline" information allows

investigators to understand the chronological context of cellular device usage, account access,

and events relating to the crime under investigation.  This "timeline" information may tend to

either inculpate or exculpate the cellular device owner.  Additionally, information stored by the

wireless provider may indicate the geographic location of the cellular device and user at a

particular time (e.g., historic cell-site location information; location integrated into an image or

video sent via text message to include both metadata and the physical location displayed in an

image or video).  Last, stored electronic data may provide relevant insight into the state of mind

of the cellular device's owner and/or user as it relates to the offense under investigation. For

example, information relating to the cellular device in the possession of the wireless provider

may indicate the owner's motive and intent to commit a crime (e.g., communications relating to

the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them

from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

29.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular, 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require AT&T to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

30.     Based on the forgoing, there is probable cause to believe that TSOSIE committed violations of 18 U.S.C. § 113(a)(4) and 18 U.S.C. § 2244(b) and that the SUBJECT ACCOUNT contains evidence relating to said offenses.  Accordingly, I request that the Court issue the proposed search warrant.

31.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on AT&T.  Because the warrant will be served on AT&T, who will then compile the requested records at a time that is convenient, reasonable cause exists to permit the execution of the requested warrant at any time of the day or night.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 20 day of  August , 2024.

ELIZABETH DIETZEN
Digitally signed by ELIZABETH DIETZEN
Date: 2024.08.20 13:09:25 -04'00'

Elizabeth Dietzen, Special Agent
Investigative Services Branch
National Park Service

____X_____Sworn by Telephone

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2024.08.20 14:54:44 -07'00'

Camille D. Bibles                                                                  Date/Time
United States Magistrate Judge